## DUPONT v. UNITED STATES.
### Nos. 4–6.

District Court, D. Delaware.
June 23, 1939.

124

Hugh M. Morris and Geo. Burton Pearson, Jr., both of Wilmington, Del., for plaintiff.

John J. Morris, Jr., U. S. Atty., of Wilmington, Del., and James E. Murphy, Sp. Asst. to Atty. Gen.

KIRKPATRICK, District Judge.

### I. Farm Losses

This phase of the case presents the question of deductibility of farm losses—a question which has been about as thoroughly explored in the decisions as any arising in the income tax law. Deductibility depends upon whether the losses were incurred "in trade or business" or "in any transaction entered into for profit, though not connected with the trade or business." Revenue Act of 1928, 45 Stat. 791, c. 852, Sec. 23(e) (1) and (2), 26 U.S.C.A. § 23 note.

Although raising stock and agricultural products for sale is essentially a business, occupying the time and labor of a large part of the population and accounting for a large proportion of the national income, the fact that it also frequently happens to be a diversion or secondary interest for many people of means has given rise to the general rule that unless it can be shown that the "farmer" was genuinely interested in making money out of the enterprise, his farming will not be considered a business and he will not be allowed to deduct his farm losses, either as losses incurred in business or as losses incurred in transactions entered into for profit.

This rule is too well settled to quarrel with now. The net result of the decisions is to make the taxpayer's profit motive the determining factor, and in each case it thus becomes a simple question of fact depending upon the particular circumstances presented. See Cecil v. Commissioner, 4 Cir., 100 F.2d 896.

It goes without saying that the profit motive must be a genuine one, and much of the discussion in the opinions has to do with a number of proposed tests for determining the genuineness of the taxpayer's intention, or, perhaps, the honesty of his declarations relating to it.

No one test has ever been put forward as completely decisive. What appeals to one judge may not appeal to another. For example, some courts have held that where it appears that a wealthy individual has, over a period of years, succeeded only in incurring a succession of heavy losses, sufficient to put the average farmer out of business, this is evidence that his farming is not a business but merely an expensive hobby. It is, of course, a matter to be considered, but I am inclined to think that it is entitled to less weight in the final verdict than some courts have accorded it.

Another factor which, it seems to me, deserves more attention is whether there is some interest, connected with the place, of greater importance in the taxpayer's scheme of life than his farming operations, or to which the farming is a mere adjunct, of little more business importance than, say, a private golf course on a country estate. This consideration gets closer to the real issue—the business intent as opposed to the hobby motive—than most of the others.

I have mentioned the two foregoing considerations because they are both brought up by the evidence in the present

case. The first makes against this taxpayer, the second in her favor.

The taxpayer acquired the farms in question in 1917. During the first 13 years of her ownership the principal activity conducted upon them consisted of the raising and breeding of fine horses. Some of these she showed, others she sold. She was greatly interested in horses, and had a wide reputation as a horsewoman. The stables on the place were large enough to take care of some 26 horses, although she never had that many at any one time. Farm products were also raised, and the surplus not used for fodder and human consumption on the farm was sold.

During all this period she never claimed her annual deficits (although they were large) as deductible losses. It is a fair inference that she did not consider that her horse raising activities constituted a business and that whatever farming was done was a mere adjunct to the main purpose for which she maintained the farms.

However, we are here concerned with the years 1931, 1932 and 1933. In 1930 she sold the last of her horses. Thereafter the farms were operated solely as agricultural enterprises. There is no evidence that they bore any of the characteristics of a country estate, at any time. The buildings were ordinary farm buildings. She never regularly resided there, although she spent a good deal of time on the farm and took an active interest and hand in the farming that was going on. It is true that after 1930 the agricultural operations were not different from those which had been carried on while the stables were being used, and that the farm manager was the same man who had charge of the whole place from the beginning. Apparently, there was a much more serious effort made to reduce expenses and more interest taken in the outgo as compared to the income. Various experiments were tried—with regard to the raising of different kinds of cattle—all of which pointed to an effort to realize a profit. Certainly there is no suggestion that the cattle were raised for show purposes or were fancy breeds. It is also of some significance that after seven years of this straight farm operation, the whole thing was given up, and the stock, machinery, and finally the farms themselves, were sold.

It must be recognized, it seems to me, that the winding up of the horse raising activities very materially changed the situation, and that the taxpayer's intent from that time on is to be gathered from an entirely new set of circumstances. The major hobby motive had ceased to exist. The taxpayer could have done one of three things. She could have abandoned the whole place and simply let it go into disuse, she could have sold it immediately, or she could have done what she did, namely, carry it on as a farm. Because she had once done some farming as an adjunct to a hobby, it seems by no means necessary to hold that it became, in itself, a hobby as soon as she gave up the other. There is certainly no difficulty, on the facts as stated, in finding that she really intended and hoped to be able to make some profit out of the place.

■ It is, of course, true that the burden of proof is generally speaking upon the taxpayer. But when the taxpayer has shown that for a period of some seven years she operated a farm, totally unconnected with any other interest or activity, that she sold the produce in the ordinary market, keeping accounts, and that she showed an active interest in the efforts to make the enterprise pay, she has gone a long way toward meeting and overcoming the burden. And I do not think that the mere fact that she continued to lose money, even though in very substantial amounts, until she wound up the operation and sold the place is sufficient to negative the necessary intent.

■ I therefore make the fact finding that the farms involved in this suit were operated during the years 1931, 1932 and 1933 by Miss duPont as a business and with the intent to make a profit.

## II. Loss on Sale of Stallion

■ A deduction was claimed on account of the loss arising from the sale of a stallion in 1931. The purchase of the stallion, in 1926, was in connection with the raising of horses which the taxpayer was then interested in. Having held that the taxpayer was not engaged in business on the farm at that time and that the purchase and sale of horses were not transactions entered into for profit, it follows that the mere fact that the stallion was sold after the beginning of genuine farming operations does not change the character of the particular transaction involved in its purchase and sale. This deduction was therefore properly disallowed.

### III. Pelleport

During 1932 and 1933 a large house which the taxpayer had formerly occupied as a residence and in which she still retained title to an undivided interest was offered for sale or rent. It was not either sold or rented during the taxable period. Certain losses were incurred in connection with its upkeep.

In Schmidlapp v. Commissioner, 2 Cir., 96 F.2d 680, 118 A.L.R. 297, and a number of cases cited in that opinion it was decided that similar losses were not deductible. The point of the decisions is that the taxpayer not being engaged in the real estate business, his right to deduct losses can only arise "in any transaction entered into for profit," and that a mere offer for sale or rent, or placing a property in a broker's hands for that purpose, is not a "transaction." I think the rule of the Schmidlapp case applies, and that the losses on Pelleport are not deductible.

### IV. The Government's Claim based on Alleged Improper Deductions for Plaintiff's Financial Secretary's Salary

The plaintiff deducted from her taxable income for each of the years here involved the salary paid her financial secretary and certain small items for safe deposit box rentals. At the trial the plaintiff called her financial secretary as a witness, and the nature of his duties and her financial transactions were developed in the course of his testimony. The Government now claims that the deductions of his salary were improper and that under the doctrine of Lewis v. Reynolds, 284 U. S. 281, 52 S.Ct. 145, 76 L.Ed. 293, the plaintiff can not recover for overpayment claimed because of the deductibility of the farm losses if her correct tax liability as determined after disallowing these deductions absorbs them. The Government contends that the matter is properly at issue without amendment, but, in the alternative, asks for leave to amend with the right to the plaintiff to a continuance to enable her to meet the issue thus presented.

The whole subject was very fully discussed in Routzahn v. Brown, 6 Cir., 95 F.2d 766. In that case a similar amendment was offered and refused after judgment in favor of the Collector and reversal by the Circuit Court of Appeals, but before a second trial. The court pointed out that the matter is discretionary, calls for the application of equitable principles, and that under the circumstances of that case there was no inequity or abuse of discretion in denying the amendment.

This case does not present a situation quite so strongly against the request to amend, but I think the equities are quite sufficient to require denial of it. It does appear that no specific notice was given of the purpose of the Government to raise the question of deductibility of any items other than those which have been already discussed, and that the Treasury Department, after audit and investigation, sent the plaintiff a copy of an official report relating to the year 1932, in which there expressly appeared the deduction of the secretary's salary. The Government filed its original answer in October, 1937, and filed an amended answer more than three months before the trial. There is not the slightest suggestion of fraud or concealment on the part of the taxpayer. Under all these circumstances I think it proper to deny the proposed amendment.

I further hold that the deductibility of the secretary's salary is not an issue "tried by express or implied consent of the parties" in this suit under Rule. 15(b) of the Rules of Civil Procedure, 28 U.S. C.A. following section 723c.

### V. Rulings on Evidence

The Government's objections to the offer of Exhibits 14 and 15 are overruled.

The statements of fact contained in the foregoing opinion may be taken as special findings.

The following conclusions of law are stated:

1. The farm losses claimed are properly deductible.

2. The loss claimed on the sale of the stallion L'Aiglon is not properly deductible.

3. Losses claimed in connection with the Pelleport house are not properly deductible.

4. The Government is not entitled to amend its answer so as to raise the question of the deductibility of the financial secretary's salary and the items of safe deposit box rentals.

5. The foregoing issue is not in the case by express or implied consent of the parties under the Rules of Civil Procedure.

Judgment accordingly.